NIALL P. McCARTHY (SBN 160175)
nmccarthy@cpmlegal.com
ADAM J. ZAPALA (SBN 245748)
azapala@cpmlegal.com
ELIZABETH T. CASTILLO (SBN 280502)
ecastillo@cpmlegal.com
REGINA WANG (SBN 326262)
rwang@cpmlegal.com
KEVIN J. BOUTIN (SBN 334965)
kboutin@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

WILLIAM PLETCHER (SBN 212664)       CHRISTINA TUSAN (SBN 192203)
will@consumerwatchdog.org           ctusan@ctusanlaw.com
BENJAMIN POWELL (SBN 311624)        ADRIAN BARNES (SBN 253131)
ben@consumerwatchdog.org            abarnes@ctusanlaw.com
**CONSUMER WATCHDOG**               **TUSAN LAW, PC**
6330 San Vicente Blvd., Suite 250   680 E. Colorado #180
Los Angeles, CA 90048               Pasadena, CA 91101
Telephone: (310) 392-0522           Telephone: (626) 418-8203
Facsimile: (310) 392-8874           Facsimile: (626) 619-8253

*Attorneys for Plaintiffs and the Proposed Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEN HEROLD, GINA STABILE, LYNN ELIAS, MICHAEL SIMMONS, ROBERT LASIEWICZ, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CHEVRON CORPORATION; CHEVRON U.S.A, INC.; VALERO ENERGY CORPORATION; VALERO REFINING COMPANY-CALIFORNIA; ULTRAMAR, INC.; PBF ENERGY INC.; MARTINEZ REFINING COMPANY LLC; TORRANCE REFINING COMPANY LLC; MARATHON PETROLEUM COMPANY LP; and PHILLIPS 66 COMPANY,<br><br>Defendants. | CASE NO.  3:25-cv-10282<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE**<br><br>1. **UNFAIR COMPETITION LAW (BUS. & PROF. CODE § 17200 et seq.)**<br><br>2. **CARTWRIGHT ACT (BUS. & PROF. CODE § 16700 et seq.)**<br><br>3. **SECTION 1 OF THE SHERMAN ANTITRUST ACT (15 U.S.C. § 1)**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

**CLASS ACTION COMPLAINT**

# **TABLE OF CONTENTS**

**Page No.**

I.    INTRODUCTION ................................................................................................ 1

II.   PARTIES ........................................................................................................... 5

      A.    Plaintiffs ................................................................................................ 5

      B.    Defendants ............................................................................................ 6

III.  JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT ................ 9

IV.   FACTUAL ALLEGATIONS ............................................................................ 10

      A.    California's LCFS Program .................................................................. 10

      B.    California's SB 1322 Reporting Requirements ................................... 11

      C.    Defendants' Unlawful Scheme: Inflating LCFS Cost and Gasoline Prices ............ 12

      D.    Overcharge Timeline ........................................................................... 16

      E.    Plus Factors Corroborate Defendants' Agreement To Artificially Inflate
            LCFS Compliance Costs ...................................................................... 18

      F.    Economic Evidence Further Demonstrates Defendants' Coordinated Conduct
            in the Relevant Market ........................................................................ 20

V.    CLASS ACTION ALLEGATIONS ................................................................. 20

VI.   CAUSES OF ACTION ................................................................................... 25

      FIRST CAUSE OF ACTION
      Violations of the California Unfair Competition Law
      (Cal. Bus. & Prof. Code § 17200 et seq.) .................................................... 25

      SECOND CAUSE OF ACTION
      Violations of the Cartwright Act - Unlawful Trust/Combination
      in Restraint of Trade
      (Cal. Bus. & Prof. Code § 16720 et seq.) ................................................... 28

      THIRD CAUSE OF ACTION
      Violation of Section 1 of the Sherman Act
      (15 U.S.C. § 1) ............................................................................................. 31

VII.  PRAYER FOR RELIEF ................................................................................. 32

VIII. JURY DEMAND ........................................................................................... 34

1        Ken Herold, Gina Stabile, Lynn Elias, Michael Simmons, and Bob Lasiewicz, individually

2    and on behalf of all others similarly situated, bring this action against Defendants Chevron

3    Corporation and Chevron U.S.A. Inc. (collectively, "Chevron"), Valero Energy Corporation, Valero

4    Refining Company-California, and Ultramar, Inc. (collectively, "Valero"), PBF Energy Inc.,

5    Martinez Refining Company LLC, and Torrance Refining Company LLC (collectively, "PBF"),

6    Marathon Petroleum Company LP ("Marathon"), and Phillips 66 Company ("Phillips 66")

7    (collectively, "Defendants"). Plaintiffs' allegations against Defendants are based upon information

8    and belief and upon investigation of Plaintiffs' counsel, except for allegations specifically pertaining

9    to Plaintiffs, which are based upon Plaintiffs' personal knowledge.

## I.    <u>INTRODUCTION</u>

11        This putative class action challenges an unlawful scheme by the five largest oil refiners

12    operating in California to inflate the reported compliance cost of the state's Low Carbon Fuel

13    Standard ("LCFS") program, and to pass those inflated costs on to California consumers through

14    increased gasoline prices. Each month, Defendants Chevron, Valero, PBF, Marathon, and Phillips

15    66 are required to submit data about that month's gasoline refining margins, including the specific

16    costs associated with California's LCFS program. Volume-weighted reports compiled from

17    Defendants' monthly submissions show a sudden increase of approximately 7 cents per gallon in

18    LCFS-related costs beginning January 1, 2025, despite no change in actual LCFS market credit

19    prices and no change in regulatory obligations. This hidden overcharge implemented by each

20    Defendant has added hundreds of millions of dollars to the cost of gasoline for California consumers,

21    in direct violation of antitrust and California consumer protection laws.

22        1.     The LCFS program is one of the most important regulatory tools in California's fight

23    for a clean environment. It is designed to encourage the use of cleaner low-carbon transportation

24    fuels in California, encourage the production of those fuels, and, thereby, reduce greenhouse gas

25    emissions. In simple terms, it creates a market-based incentive to reduce greenhouse gas emissions

26    from transportation fuels by rewarding cleaner alternatives and penalizing carbon-intensive fuels

27    like gasoline.

28    / / /

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

2.      When functioning properly, the LCFS program ensures that fuel providers pay the true cost of their carbon pollution and that consumers and businesses are encouraged to adopt lower-carbon emission options. But this system depends entirely on accurate cost accounting. When oil companies inflate their reported LCFS costs, they distort the market signal. The inflated cost burdens from the corresponding increase in gas prices fall on consumers who are then saddled with unjustified price increases, not polluters, and the effectiveness of the LCFS program as a climate pricing mechanism is diminished. Moreover, if the public comes to see the LCFS program as a driver of unexplained fuel-price spikes, it risks eroding political support for one of the state's most effective and carefully calibrated climate programs. In short, misreporting LCFS costs harms California consumers, hinders California's climate strategy, and interferes with California's global leadership on carbon regulation.

3.      In 2022, Consumer Watchdog sponsored, and the California Legislature enacted, SB 1322 to bring long-overdue transparency to the opaque gasoline market. The law requires each refiner to file monthly reports with the California Energy Commission ("CEC") disclosing its actual refining, distribution, and regulatory compliance costs—including costs associated with the LCFS program. These reports, required by regulation to be "true, accurate, and complete," are signed under penalty of perjury and made public. SB 1322 was designed to allow consumers, regulators, and policymakers to "follow the money" and understand why California's gasoline prices are consistently among the highest in the nation.

4.      Under SB 1322, refiners must report monthly per-gallon LCFS costs to the CEC within 30 days of the end of each calendar month. However, no 2025 figures were published until May 2025. By June 2025, CEC staff publicly confirmed they were investigating those self-reported figures and both CARB and the CEC possessed data and analysis which showed that refiners were embedding LCFS compliance costs into gasoline prices months before the 2025 LCFS amendments took effect. CARB's June 27, 2025 press release acknowledged that independent experts projected that the incremental cost impact of the LCFS amendments that became effective July 1, 2025 would be 5–8 cents per gallon. Yet analysis of SB 1322 data reported to the CEC—as confirmed by CARB in a July 16 memo—concluded that these 5–8 cents per gallon of amendment-related LCFS costs

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

had already been embedded in retail fuel prices as of January 1, 2025, months before the amendments became effective. CARB specifically determined that "[s]tarting January 1, 2025, the reported compliance cost increased by 7 cents per gallon above the previously reported compliance cost pass-through," and "[t]his reported increase in LCFS compliance cost pass-through related to LCFS came during a time over which the LCFS credit price decreased and before the most recent LCFS amendments became effective." In other words, refiners were embedding future projected compliance costs into current pricing and reporting, collecting the value of credits even though those costs had not yet been incurred and the new regulatory standard was not yet in effect.

5.      The impact of this inflated cost is staggering. California consumers purchase more than 13 billion gallons of gasoline annually. The Defendants' 5- to 8-cent per gallon overcharges provided them with a statewide windfall of hundreds of millions of dollars over the five-month overcharge period —money siphoned from families, commuters, and small businesses already struggling with high transportation costs, high inflation, and high tariffs.

6.      California's gasoline market is uniquely susceptible to anti-competitive conduct. Unlike most U.S. states, California is geographically isolated from other major fuel supply hubs and lacks interstate pipelines that can bring in gasoline from out of state. This makes California a virtual "gasoline island," heavily dependent on in-state refining and vulnerable to localized supply disruptions or coordinated pricing behavior. Adding to this structural fragility, California requires a special cleaner-burning gasoline blend, which complies with strict air-quality standards but can only be produced by a small number of refineries worldwide. This means out-of-state or overseas suppliers cannot easily fill supply gaps or moderate in-state price hikes.

7.      As of 2014, seven companies controlled most of California's in-state gasoline refining capacity—including all five Defendants in this action or their corporate predecessors. Since then, industry consolidation has only increased that dominance. Following several refinery sales, closures, and mergers—including PBF's acquisition of major California refineries from ExxonMobil and Shell—just five companies now control about 97% of California's gasoline supply: Defendants Chevron, Valero, Marathon, Phillips 66, and PBF.

/ / /

**CLASS ACTION COMPLAINT**

8.      This extreme market concentration means that when these companies act in parallel—whether by reducing supply, raising prices, or, as here, simultaneously inflating cost reports—the effect on consumers is immediate and unavoidable. California drivers of gas-powered vehicles have virtually no competitive alternatives. Refiners know this, and the pricing data reflects it: In early 2024, California gasoline prices were roughly $1.35 per gallon higher than the national average, according to the California Governor's Office. Even after accounting for higher taxes and climate program costs, regulators have consistently found a large, unexplained "mystery gasoline surcharge" that cannot be justified by normal market dynamics. This price premium—borne disproportionately by working families and small businesses—has fueled longstanding concerns that California's gasoline market is being manipulated by firms that know they can agree to move in lockstep without consequence. The LCFS overcharge alleged here fits precisely into that pattern.

9.      Defendants' misrepresentation of LCFS costs is part of a broader pattern of market manipulation that has harmed California consumers for years. In October 2025, the California Division of Petroleum Market Oversight released a report finding that from 2015 to 2024, California gas prices have included mysterious surcharges of roughly 41 cents per gallon. The report estimates these overcharges have cost California gas consumers roughly $59 billion over that time. The report concludes that gas producers have consistently reported different operating costs to investors than to the CEC. As a result of this conduct, among other things, gross refining margins for gas sold in California have significantly exceeded refining margins in other states and internationally. Thus, Defendants' phantom LCFS surcharge is just one aspect of the long-running unjustified price inflation Defendants have imposed on California consumers.

10.     Defendants' conduct violates Section 1 of the Sherman Act (15 U.S.C. § 1), the Unfair Competition Law (Bus. & Prof. Code § 17200 et seq.) and the Cartwright Act (§ 16700 et seq.). It is unlawful, among other reasons, because it contravenes express reporting regulations and public transparency duties under SB 1322. It is unfair, among other reasons, because it forces consumers to pay for regulatory costs when they do not exist. It is also anticompetitive, because each Defendant agreed to mirror the same unjustified price increase—a textbook case of collusion or unlawful agreement to inflate prices.

11.    Plaintiffs seek to stop these practices and make California consumers whole. Under the Unfair Competition Law ("UCL"), Plaintiffs seek injunctive relief to compel Defendants to correct their ongoing unlawful reporting and pricing practices (including an injunction requiring truthful cost reports, an independent audit of past LCFS cost reporting, and the removal or rollback of the inflated charges). Plaintiffs also seek restitution and disgorgement of the unlawful overcharges—an estimated $350 million or more in aggregate (approximately 5–8 cents per gallon on billions of gallons) for the initial five-month period of 2025 alone. Under the Cartwright Act, Plaintiffs seek, among other relief, treble damages for Defendants' anticompetitive overcharges. Finally, Plaintiffs seek an award of attorneys' fees under Code of Civil Procedure § 1021.5 (the private attorney-general doctrine) and any other applicable law, because this action enforces important public rights and will confer a significant benefit on the general public by saving them hundreds of millions of dollars in unlawful overcharges, promoting honest reporting and fair gasoline pricing,  and supporting California's climate action policy, including the LCFS, to fight climate change.

## II.    **PARTIES**

### A.    **Plaintiffs**

12.    Ken Herold is a citizen of California, residing in South Pasadena. Between January 1, 2025 and May 31, 2025, Mr. Herold purchased gasoline in California from an ARCO gas station in South Pasadena. Unbeknownst to Mr. Herold at the time, the price he paid for gasoline was higher by approximately 5–8 cents per gallon due to Defendants' wrongful inflation of fuel costs under the guise of LCFS compliance. Mr. Herold was economically injured by these overcharges.

13.    Gina Stabile is a citizen of California, residing in Ventura. Between January 1, 2025 and May 31, 2025, Ms. Stabile purchased gasoline from a Chevron gas station in Ventura; ARCO gas stations in Santa Barbara and Ventura; a Shell gas station in Ventura; a Speedway gas station in Ventura; a Turnpike Fuel gas station in Santa Barbara; a World Oil gas station in Ventura; a USA Petroleum gas station in Santa Barbara; a United Pacific gas station in Santa Barbara; 7-Eleven gas stations in Valencia and Los Angeles; and a USA Gas station in Ventura. Unbeknownst to Ms. Stabile at the time, the price she paid for gasoline was higher by approximately 5–8 cents per gallon

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

due to Defendants' wrongful inflation of fuel costs under the guise of LCFS compliance. Ms. Stabile was economically injured by these overcharges.

14.    Lynn Elias is a citizen of California, residing in Los Angeles. Between January 1, 2025 and May 31, 2025, Ms. Elias purchased gasoline from Chevron gas stations in San Luis Obispo, Los Angeles, Pasadena, and Marina Del Rey; a 76 gas station in Los Angeles; a Costco gas station in Alhambra; Shell gas stations in Eagle Rock, Glendale, Los Angeles, and Pacific Grove; a Von's gas station in La Verne; and a Circle K gas station in Lompoc. Unbeknownst to Ms. Elias at the time, the price she paid for gasoline was higher by approximately 5–8 cents per gallon due to Defendants' wrongful inflation of fuel costs under the guise of LCFS compliance. Ms. Elias was economically injured by these overcharges.

15.    Michael Simmons is a citizen of California, residing in Los Angeles. Between January 1, 2025 and May 31, 2025, Mr. Simmons purchased gasoline from a Conserv gas station in Los Angeles. Unbeknownst to Mr. Simmons at the time, the price he paid for gasoline was higher by approximately 5–8 cents per gallon due to Defendants' wrongful inflation of fuel costs under the guise of LCFS compliance. Mr. Simmons was economically injured by these overcharges.

16.    Robert Lasiewicz is a citizen of California, residing in La Canada. Between January 1, 2025 and May 31, 2025, Mr. Lasiewicz purchased gasoline from Union 76 gas stations in La Canada; a Shell gas station in Davis; an Arco gas station in Kings City; and an Exxon gas station in Los Angeles. Unbeknownst to Mr. Lasiewicz at the time, the price he paid for gasoline was higher by approximately 5–8 cents per gallon due to Defendants' wrongful inflation of fuel costs under the guise of LCFS compliance. Mr. Lasiewicz was economically injured by these overcharges.

**B.    Defendants**

17.    Chevron: Defendant Chevron Corporation is a corporation organized under the laws of Pennsylvania with its principal place of business in Texas that is registered to do business in California. Defendant Chevron U.S.A. Inc. is a corporation organized under the laws of Pennsylvania with its principal place of business in Texas that is registered to do business in California. In connection with the Chevron major oil refineries in Richmond and El Segundo, California, Chevron Corporation and/or Chevron U.S.A. Inc. submit monthly cost reports under SB

1322 and, as alleged herein, reported inflated LCFS compliance costs and charged inflated prices as part of the scheme at issue starting on or around January 2025. On information and belief, Chevron refineries supply gasoline to Chevron and Texaco gas stations, in addition to wholesale markets.

18.    Valero: Defendant Valero Energy Corporation is a corporation organized under the laws of Delaware with its principal place of business in Texas that is registered to do business in California. Defendant Valero Refining Company-California is a corporation organized under the laws of Delaware with its principal place of business in Texas that is registered to do business in California. Defendant Ultramar, Inc., dba Valero Wilmington Refinery is a corporation organized under the laws of Nevada with its principal place of business in Texas that is registered to do business in California. Valero Refining Company-California operates a major oil refinery in Benicia, California and Ultramar, Inc. operates a major oil refinery in Wilmington, California. On information and belief, Valero Refining Company-California, Valero Energy Corporation, and Ultramar, Inc. are responsible for submitting monthly cost reports under SB 1322 and, as alleged herein, reported inflated LCFS compliance costs and charged inflated prices as part of the scheme at issue starting on or around January 2025. On information and belief, Valero's refinery supplies gasoline to Valero gas stations, in addition to wholesale markets, including but not limited to Costco gas stations.

19.    PBF: Defendant PBF Energy Inc. is a corporation organized under Delaware law with headquarters in New Jersey that is registered to do business in California. Defendant Martinez Refining Company LLC is a corporation organized under Delaware law with headquarters in New Jersey. Defendant Torrance Refining Company LLC is a corporation organized under Delaware law with headquarters in New Jersey. Martinez Refining Company LLC operates a major refinery in Martinez, California and Torrance Refining Company LLC operates a major refinery in Torrance, California. On information and belief, PBF Energy Inc., Martinez Refining Company LLC, and Torrance Refining Company LLC are responsible for submit monthly cost reports under SB 1322 and, as alleged herein, reported inflated LCFS compliance costs and charged inflated prices as part of the scheme at issue starting on or around January 2025. PBF's refineries supply gasoline to Shell gas stations, in addition to wholesale markets.

**CLASS ACTION COMPLAINT**                                                      7

20.     Marathon: Defendant Marathon Petroleum Company LP is a limited partnership organized under Delaware laws with its principal place of business in Ohio that is registered to do business in California. Marathon operates a major refinery in Los Angeles County, California. Marathon is required to submit monthly cost reports under SB 1322 and, as alleged herein, reported inflated LCFS compliance costs and charged inflated prices as part of the scheme at issue starting on or around January 2025. Marathon's refineries supply gasoline to ARCO and Marathon gas stations, in addition to wholesale markets.

21.     Phillips 66: Defendant Phillips 66 Company is a corporation organized under Delaware law with its principal place of business in Texas that is registered to do business in California. Phillips 66 operates a major refinery in Los Angeles County, California. Phillips 66 is required to submit monthly cost reports under SB 1322 and, as alleged herein, reported inflated LCFS compliance costs and charged inflated prices as part of the scheme at issue starting on or around January 2025. Phillips 66's refinery supplies gasoline to 76 and Phillips 66 brand gas stations, in addition to wholesale markets.

22.     Defendants Chevron, Valero, PBF, Marathon, and Phillips 66 collectively control about 97% of California's gasoline supply. Defendants are therefore responsible for the inflated costs of gasoline at the gas stations discussed in paragraphs 12 to 16. For example, as detailed above, Chevron gas stations get their gasoline from Defendant Chevron; ARCO gas stations get their gasoline from Defendant Marathon; 76 gas stations get their gasoline from Defendant Phillips 66; Shell gas stations get their gasoline from PBF, and Costco gas stations get their gasoline from a variety of refineries including Valero and PBF.

23.     At all relevant times, each Defendant was the agent, representative, or co-conspirator of the others in effectuating the misconduct alleged, or otherwise acted in concert with or with knowledge of the other Defendants' actions. The five Defendants refine and market most of California's in-state gasoline. Each Defendant files a separate SB 1322 report each month, and their volume-weighted reports reflected a premature LCFS surcharge starting January 1, 2025, which was also directly reflected in higher gas prices at the pump. The wrongful acts were undertaken by all Defendants in a parallel manner and resulted in a uniform impact on California's gasoline purchasers

statewide. Defendants are collectively responsible for the overcharges imposed on Plaintiffs and the Class. Whenever this Complaint refers to an act or omission of Defendants, that allegation shall be deemed to mean all Defendants acting jointly or through their officers, agents, or employees.

24.    Whenever this Complaint refers to any act, deed, or transaction of any corporation or other business entity, the allegation means that the corporation or business entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of its business or affairs.

25.    Each Defendant acted as the agent or joint venturer of, or for, the other Defendants with respect to the acts, violations, and common course of conduct alleged in this Complaint. The acts alleged were done through Defendants and their use of Defendants' subsidiaries, affiliates, divisions, or other related entities and through their respective officers, directors, employees, agents, or representatives, who were acting within the scope of their authority and for the benefit of their respective principals.

26.    To the extent that any parent companies, subsidiaries, or affiliates of Defendants participated in, facilitated, or benefitted from the conduct alleged herein, Plaintiffs reserve the right to name them as additional Defendants as their identities and roles become known through discovery.

III.    **JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT**

27.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the amount in controversy exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative class members as defined below, and minimal diversity exists; 28 U.S.C. § 1331 with respect to the cause of action arising under Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1); and 28 U.S.C. § 1367 with respect to the causes of action arising under state law.

28.    The Court has personal jurisdiction over each Defendant because each conducts substantial business in California, has purposely availed itself of the California market, and committed the unlawful acts in California that are the subject of this Complaint. Defendants'

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

misconduct—including the submission of false cost reports to California regulators and the sale of gasoline within California at inflated prices—occurred in and was directed at California. Each Defendant's California refining and sales operations (e.g., refineries in Los Angeles County, El Segundo, Richmond, Torrance, Martinez, Benicia, and Wilmington) establish continuous and systematic contacts with this state, and the claims herein arise from those contacts.

29.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 and Civil L.R. 3-2(c) because a substantial portion of the acts or omissions giving rise to the claims in this Complaint occurred in this District, and because Defendants are subject to the Court's personal jurisdiction with respect to this action. Indeed, over one-third of California's crude oil capacity comes from refineries in Richmond, Martinez, and Benicia, all located in this District.

## IV.    FACTUAL ALLEGATIONS

### A.    California's LCFS Program

30.    California's Low Carbon Fuel Standard program is a regulatory program intended to reduce the carbon intensity of transportation fuels. It requires fuel producers (like Defendants) to ensure that their fuel mix meets annual carbon intensity targets, often by blending lower-carbon fuels or purchasing LCFS credits. If a refiner's fuel is above the target carbon intensity, it must purchase LCFS credits (from providers of cleaner fuels) to offset the excess emissions. The cost of LCFS credits fluctuates based on market trading. This cost is effectively a per-gallon compliance cost for gasoline sold in the state.

31.    The cost of LCFS credits has generally remained stable or even declined in the past few years. Data from CARB's Weekly LCFS Credit Transfer Activity Report shows that from January 1, 2023 to December 29, 2024, LCFS credits traded for a weekly credit price of between $46.54 and $85.44 per metric ton of carbon dioxide, with a mean price of $68.51 and a median price of $69.62 per metric ton of carbon dioxide. From December 30, 2024 to June 1, 2025, LCFS credits traded for a weekly credit price of between $55.62 and $71.54, with a mean price of $65.07 and a median price of $65.82 per metric ton of carbon dioxide.[1]

---

[1] California Air Resources Board, Weekly LCFS Credit Transfer Activity Reports (updated Aug. 17, 2025), https://ww2.arb.ca.gov/resources/documents/weekly-lcfs-credit-transfer-activity-reports.

**CLASS ACTION COMPLAINT**                                                                    10

32.    **Changes to LCFS:** In late 2024, CARB considered amendments to the LCFS program to better meet its objectives to transition to lower-carbon fuel sources. Although new stricter standards were anticipated, no new LCFS obligations or changed targets took effect on January 1, 2025. Instead, in the first few months of 2025, CARB submitted and then resubmitted its final rulemaking package to the California Office of Administrative Law for approval. On June 27, 2025, CARB announced that the amended LCFS program would be effective starting July 1, 2025. This means that from January to June 2025, refiners were still operating under the then-existing LCFS rules and credit obligations, and any increased burden from amended LCFS rules would only apply starting July 1, 2025. Since the market price of credits also did not increase, there was no regulatory justification for an increase in reported per-gallon LCFS cost in the first half of 2025.

**B.    California's SB 1322 Reporting Requirements**

33.    **Oil Refinery Cost Disclosure**: To promote transparency in fuel pricing, California enacted Senate Bill 1322 (SB 1322), the Oil Refinery Cost Disclosure Act, effective January 1, 2023. SB 1322 (codified in California's Public Resources Code and implemented by regulations at 20 CCR § 1301 et seq.), which requires all refiners operating in California to submit monthly reports to the CEC detailing specified cost, pricing, and volume information. These reports include data on the refiner's cost of crude oil, refining and production costs, gross refining margins (profits per gallon), and costs attributed to complying with state regulations such as the cap-and-trade program and the LCFS. *See, e.g.*, Cal. Pub. Res. Code § 25355(b)(6). The legislative intent behind SB 1322 was to "force the oil refiners to open their books" and allow regulators and the public to "follow the money" behind California's gasoline prices. Transparency was a tool the legislature selected to help prevent excessive profits or price gouging that might be concealed behind claimed expenses like environmental fees.

34.    **Duty of Truthfulness – Penalty of Perjury**: SB 1322's implementing regulations impose strict truthfulness requirements on refiners' reports. Title 20 of the California Code of Regulations, section 1303, which governs all such reports, mandates that each report must include a declaration under penalty of perjury by an authorized officer of the company attesting that the report's contents are "true, accurate, [and] complete" to the best of their knowledge after diligent

investigation. In other words, refiners have a legal duty to report actual costs accurately and honestly. Submitting false data or omitting material facts in these reports is unlawful and can subject the company to penalties and other legal consequences. Each Defendant accordingly certified the truth of its monthly submissions under oath.

35. **Reporting of LCFS Costs**: Among the line items in the SB 1322 monthly report is the cost per gallon attributable to compliance with the LCFS. Cal. Pub. Res. Code § 25355. Refiners calculate this by taking the net cost of acquiring LCFS credits (or the benefit of surplus credits sold) and dividing by the volume of fuel. The CEC reports volume-weighted average LCFS compliance costs using data provided by Defendants, and from January 1, 2023 to December 31, 2024, these monthly LCFS compliance costs averaged between 7 and 12 cents per gallon, which was consistent with prevailing LCFS credit market prices during that time. In other words, the reports for two years showed refiners were passing through actual LCFS compliance costs of around ten cents per gallon directly to consumers and businesses who were purchasing gas in California.

C. **Defendants' Unlawful Scheme: Inflating LCFS Cost and Gasoline Prices**

36. **Abrupt Increase in January 2025**: CARB staff who reviewed the LCFS compliance costs reported by individual refiners to the CEC pursuant to SB 1322 observed increased LCFS compliance costs starting January 2025. The volume-weighted LCFS compliance costs Defendants reported for the first few months of 2025 also showed a dramatic increase starting January 2025, from an average 12 cents per gallon charged in December 2024 to an average 19 cents per gallon charged in January 2025. This unexplained jump continued throughout the first five months of 2025. While Defendants' LCFS *actual* compliance costs averaged between 7 and 12 cents in 2023 and 2024, their *reported* LCFS compliance costs from January to May 2025 averaged between 15 and 19 cents per gallon, as shown in the figure below.[2]

/ / /

/ / /

---

[2] This chart was prepared by Danny Cullenward and is available at https://kleinmanenergy.upenn.edu/commentary/blog/tracking-gasoline-price-impacts-in-california-part-1/.

**CLASS ACTION COMPLAINT**

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP



37.     Critically, this increase in reported LCFS compliance costs was not accompanied by any actual change in law that would increase LCFS obligations at that time, nor by any surge in LCFS credit prices. As discussed above, LCFS credit prices in the first five months of 2025 were actually lower on average than the average prices throughout 2023 and 2024, and no new LCFS rule was in effect. Thus, on its face, the ~7-cent increase in reported costs was inexplicable and unjustified.

38.     Defendants have never even acknowledged—much less compensated anyone for—the inflated costs they passed on to consumers, small businesses, and others during the first five months of 2025.

39.     **Phantom Cost Embedment**: Subsequent investigation by state regulators revealed what happened—Defendants had started charging consumers for a future regulatory cost before it was owed. CARB officials examining the data in early 2025 found that since January 2025, refiners have been including an additional roughly 5–8 cents in retail fuel prices which they have reported as LCFS compliance costs in anticipation of the stricter LCFS rules that had not yet begun. In other words, each Defendant prematurely treated the not-yet-effective LCFS obligations as if they were

already in force, and started incorporating the amended LCFS obligations into their prices. This extra margin (5–8 cents per gallon) was pure profit and not actually expended on any current LCFS credits or compliance activity.

40.     Indeed, according to a model prepared by economist Danny Cullenward as shown in the figure below, the observed LCFS price increase in January 2025 directly matches the predicted LCFS price if new regulations were in place, rather than the predicted price without them.[3]



41.     While the nation on average saw lower gas prices between January and June of 2025, retail prices in California increased during the same period that the Defendants reported inflated LCFS compliance costs:

i.     The U.S. Energy Information Administration reported average monthly gas prices across the United States of between $3.018 and $3.389 for the last five months of 2024, or an average price of $3.1622 across those five months. In the first five months of 2025, gas prices were generally lower, ranging from $3.076 to $3.150, for an

---

[3] This model is available at https://kleinmanenergy.upenn.edu/commentary/blog/tracking-gasoline-price-impacts-in-california-part-2/.

**CLASS ACTION COMPLAINT**                                                                 14

average price of $3.1228 per gallon across those five months.[4] In other words, national gas prices decreased in the first five months of 2025.

ii. In contrast, California gas prices ranged from $4.243 to $4.574 for the last five months of 2024, or an average price of $4.4272 across those five months. Prices then increased for the first five months of 2025, ranging from $4.310 to $4.764, or an average price of $4.603 per gallon.[5] In other words, California gas prices increased by on average almost 18 cents per gallon in the first five months of 2025.

iii. On information and belief, Defendants thus incorporated their improperly inflated LCFS compliance costs into increased gas prices.

42. **Coordinated Conduct**: SB 1322 reports showed a marked spike for LCFS compliance costs from January through May 2025, and during this same time, Californians faced inflated gas prices that did not match national trends. This evidence points to all five Defendants acting in concert to inflate their LCFS compliance costs and pass these inflated costs onto consumers. Defendants' conduct resulted in a uniform impact: gasoline prices statewide incorporated a line item inflated by ~5–8 cents without any basis. Defendants thereby distorted the market price of gasoline in California, causing an industry-wide price increase that consumers had no choice but to pay as they collectively controlled essentially the entire gasoline market in California.

43. **Misleading Justifications**: By each embedding a phantom cost in the "LCFS compliance cost" line of official reports, Defendants gave the appearance that their increased prices were legitimately tied to higher regulatory costs. This misrepresentation led regulators, policymakers, and the public to believe that California's climate policy was responsible for adding ~18 cents to each gallon of gas, shifting the blame for pricier gasoline onto environmental regulations rather than refiner profit margins. In reality, as noted above, actual LCFS costs remained much lower (likely under 10 cents per gallon). Defendants' overstatement of their respective LCFS

---

[4] U.S. Energy Information Administration, U.S. Regular All Formulations Retail Gasoline Prices, https://www.eia.gov/dnav/pet/hist/leafhandler.ashx?n=pet&s=emm_epmr_pte_nus_dpg&f=m.

[5] U.S. Energy Information Administration, California All Formulations Retail Gasoline Prices, https://www.eia.gov/dnav/pet/hist/leafhandler.ashx?n=pet&s=emm_epm0_pte_sca_dpg&f=m.

**CLASS ACTION COMPLAINT**                                                              15

costs thus created a false narrative that could fan public discontent over California's carbon regulations and deflect scrutiny away from Defendants' own pricing decisions.

44.     **Consumers Harmed**: California drivers began 2025 by paying more at the pump than warranted. Even at just 5 cents extra per gallon across an enormous volume of sales, the economic impact on consumers has been enormous. California's annual gasoline consumption is over 13 billion gallons, so a 5 cents per gallon overcharge equates to roughly $650 million per year—over $54 million per month—siphoned from Californians' pockets (and at 7 to 8 cents per gallon, the figure is well over $900 million per year). Defendants' phantom carbon surcharge was not money Defendants spent to comply with California's LCFS—instead, it went straight from consumers to Defendants' bottom line as excess profit. The burden of these hidden costs falls disproportionately on lower-income households which spend a greater share of their income on fuel and have few alternatives, making this practice highly regressive and harmful to those least able to afford it.

45.     **Public Interest Impacts**: Beyond direct and significant monetary harm to consumers, Defendants' falsification of cost data undermines various public interests. The point of SB 1322's transparency mandate is to illuminate the true causes of fuel price changes, so that policymakers and the public can respond appropriately. Defendants' conduct frustrates that transparency by falsely shifting blame for high pump prices onto climate policy. These unlawful claims risk eroding public support for vital environmental programs like the LCFS program by feeding a false narrative that such programs are unjustifiably costly. It also corrupts the data that agencies and researchers rely on to analyze LCFS's cost-effectiveness and distorts energy economic modeling used for planning infrastructure and climate strategy. In short, Defendants' misreporting doesn't just harm consumers financially; it harms the integrity of California's energy policy discourse and decision-making and prevents regulators and legislators from receiving accurate information that is needed to address issues associated with gas price increases.

### D.     Overcharge Timeline

46.     The following timeline summarizes the key events and evidence from late 2024 through mid-2025 that reveal Defendants' overcharge scheme, as compiled from agency findings and market analyses:

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

- **Late 2024:** CARB develops but does not yet implement amendments to the LCFS program at a time when LCFS credit prices are trending downward. Defendants' SB 1322 reports for 2024 continue to show LCFS costs in the single to low-double digits (7 to 12 cents per gallon), consistent with actual market costs.

- **January 1, 2025**: Defendants implement a ~7 cents per gallon increase in reported LCFS cost (raising the reported costs to ~19 cents per gallon) despite falling credit prices and no rule change in effect. Gasoline prices reflect this phantom surcharge. This is a prima facie unlawful price increase with no legitimate basis.

- **January to May 2025**: Defendants charge increased LCFS costs, which becomes apparent when their mandatory SB 1322 reports are later published, even as CARB submits and then resubmits its proposed new rule to OAL for approval. A later CARB investigation finds that 5–8 cents per gallon of the reported LCFS cost during this time corresponds to future LCFS requirements not yet in force, concluding that refiners are prematurely passing through costs that they are not actually incurring at the time.

- **June 2025**: After the overcharge is publicized, refiners reduce the LCFS cost down to 8 cents, which matches the credit price.

- **July 2025**: Regulations take effect and cost returns to 13 cents, the new credit price under the new regulations.

47.    **Ongoing Conduct**: Defendants' overstatement and overcharging behavior is ongoing. As of the filing of this Complaint, Defendants have not issued any corrections to their SB 1322 reports for the first five months of 2025, nor have they refunded any portion of gasoline prices to account for the phantom falsified costs. Unless enjoined by this Court, there is a reasonable likelihood that Defendants will again misreport costs and price gasoline at inflated levels to include un-incurred LCFS costs (and perhaps other overstated costs), thereby continuing to harm consumers each day. The public injunctive relief sought in this action is necessary to put a stop to this unlawful practice, to restore honest cost accounting in California's fuel markets, and to protect California consumers from millions of dollars in overcharges.

/ / /

**CLASS ACTION COMPLAINT**

17

48.    **Defendants' Knowledge and Intent**: At all relevant times, Defendants knew or should have known that their actions were wrongful. They are sophisticated companies intimately familiar with the LCFS program and their compliance timelines. They knew that no new LCFS costs were actually being incurred on January 1, 2025, yet they deliberately chose to include future costs for proposed regulations that had not yet been approved. The fact that both Defendants' reported LCFS costs and gas prices increased throughout the state suggests Defendants acted in concert to quietly implement the price increase.

49.    Defendants knew their reports were public and filed under penalty of perjury. They nonetheless inflated LCFS compliance costs for five months both in public reports and charged prices, and they did not issue a correction even when these inflated prices came to light. Defendants' conduct was coordinated, willful, and knowing.

50.    Because Defendants reported data, pursuant to SB 1322, which they knew to be false, under penalty of perjury, they violated California Penal Code § 118 each time they submitted a report to the CEC.

51.    **Summary of Wrongdoing**: In sum, Defendants orchestrated a scheme to unjustly enrich themselves at consumers' expense by falsifying a cost component in required reports and passing on to consumers this "phantom" environmental compliance cost that was not actually incurred. This scheme violated Defendants' legal obligations (including SB 1322's reporting rules), undermined the very purpose of California's fuel pricing transparency regime, and constituted an egregious unlawful and unfair business practice. Through this action, Plaintiffs seek to hold Defendants accountable, to reclaim the ill-gotten funds for California drivers, and to ensure that going forward, fuel prices reflect actual regulatory costs.

E.    **Plus Factors Corroborate Defendants' Agreement To Artificially Inflate LCFS Compliance Costs**

52.    Plus factors are economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action, and support an inference of a conspiracy. Defendants'

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

coordinated efforts to artificially inflate LCFS compliance costs are supported by the following plus factors:

53.    **Unexplained Price Increase**: From January to May 2025, reported volume-weighted LCFS compliance costs increased by ~7 cents per gallon. During the same five months, gas prices in California increased by on average almost 18 cents per gallon while gas prices nationally decreased. Such a marked increase in reported LCFS compliance costs and overall gas prices strongly supports lockstep and coordinated behavior and is unlikely to occur by chance, especially given varying corporate strategies. It reflects a coordinated plan.

54.    **Action Against Independent Self-Interest**: If any single Defendant had unilaterally overstated costs and raised its price by ~7 cents while others did not, it would risk losing sales in the competitive wholesale market or seeing its branded stations undercut by others. Thus, acting alone would be economically risky. The conduct only makes sense if each Defendant expected its rivals to do the same, implying an agreement or at least advance assurance of parallel action.

55.    **Opportunities to Conspire**: Defendants, as a tight-knit group of industry players, have many opportunities to communicate. They interact through industry conferences, joint ventures, trade association meetings, and possibly information exchange via price reporting agencies. WSPA provides a forum where refining companies discuss regulatory and market issues, and when Defendants were previously invited by the CEC to participate at a hearing on November 29, 2022, they opted instead to have the WSPA participate on their behalf. Plaintiffs will ascertain through discovery where Defendants used such forums or informal contacts to discuss the upcoming LCFS rule change and coordinated a strategy to include the changed rule in their reported LCFS costs before it went into effect.

56.    **Shared Motive**: All Defendants had a common motive to increase profits and to preemptively frame anticipated updates to California's carbon regulations as the cause for higher prices. By acting together, they could increase industry profits by hundreds of millions without any one firm taking blame or losing share. Each Defendant stood to gain from the scheme as long as all participated. This common motive facilitated collusion.

/ / /

57.    **Prior Gas Price Spikes**: There have historically been concerns about California gas price hikes caused by refineries acting in parallel. For example, on September 30, 2022, CEC Chair David Hochschild sent a letter to the executives of each of the Defendants regarding the sudden and unprecedented increase in California gas prices at the same time crude oil prices were down. In response to the gas price spike, Governor Newsom called a Special Legislature in December 2022, which created a first-of-its-kind Division of Petroleum Market Oversight within the CEC to monitor and investigate activity in the energy markets that could impact fuel prices in March 2023. Newsom also signed SB 1322, which required monthly disclosures of gasoline pricing and profits, in September 2022 to combat gasoline price spikes. While prior allegations are not adjudicated here, the context is an industry with a known history of potential price collusion. The events of early 2025 follow a pattern where refiners in California often move in unison on price-related decisions.

F.    **Economic Evidence Further Demonstrates Defendants' Coordinated Conduct in the Relevant Market**

58.    The relevant market for analyzing Defendants' conduct is the market for gasoline sold in California (specifically CARB-compliant gasoline). California is a distinct geographic market for CARB-compliant gasoline, due to its unique fuel specifications and limited import infrastructure, effectively isolating it from outside competition. All Defendants operate within this market. The market is highly concentrated, with Defendants collectively controlling almost 97% of CARB-compliant gasoline production. There are high barriers to entry as refining is capital-intensive and environmental regulations limit new entrants. Consumers cannot easily substitute gasoline with other fuels for existing vehicles, so demand is relatively inelastic in the short term. This market structure is conducive to collusion.

V.    **CLASS ACTION ALLEGATIONS**

59.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

60.    This action is brought by Plaintiffs individually and as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and the following class of similarly situated persons (the "Class"):

**CLASS ACTION COMPLAINT**

> All persons and entities who indirectly purchased gasoline that was supplied by at least one Defendant in the State of California at any time from January 1, 2025 until May 31, 2025. The Class includes individual consumers as well as businesses or other entities that indirectly purchased gasoline for end use within California. Excluded from the Class are: (a) Defendants, their officers, directors, and employees; (b) any entities in which Defendants have a controlling interest; (c) the Court and its personnel; and (d) any persons who timely and validly opt out of the Class.

61.     Plaintiffs reserve the right under Federal Rule of Civil Procedure 23 to amend or modify the Class description and/or add one or more subclasses based on information obtained in the course of this litigation.

62.     All persons who are members of the proposed Class ("Class Members") have suffered injury during the applicable limitations period, or are realistically threatened with future or ongoing injury, caused by Defendants' wrongful acts and omissions alleged herein.

63.     This action is properly brought and may be properly maintained as a class action against Defendants pursuant to the following provisions of Rule 23:

i.     **Numerosity (Rule 23(a)(1)):** The Class is so numerous that joinder of all members is impracticable. California is the largest gasoline market in the U.S., with over 13 billion gallons of gasoline sold annually. The U.S. Department of Energy reports that over 31 million gas-powered vehicles were registered in California as of 2023. Plaintiffs estimate that the Class includes millions of consumers statewide who bought gasoline during the relevant time period and paid the inflated price. Joinder of all such persons is impractical, and class treatment is the only feasible method to adjudicate their claims.

ii.     **Commonality and Predominance (Rule 23(a)(2) and 23(b)(3)):** There are questions of law and fact common to the members of the Class that predominate over any questions affecting only individual members, including:

i.     Whether Defendants reported and represented inflated LCFS compliance costs in 2025 even though these additional costs were not incurred at that time;

---

**CLASS ACTION COMPLAINT**                                                    21

ii.   Whether Defendants entered an unlawful agreement to artificially inflate the price of gasoline by misrepresenting LCFS compliance costs in violation of antitrust laws;

iii.  Whether Defendants' conduct of embedding a phantom 5–8 cents per gallon "LCFS cost" into gasoline prices constitutes an unlawful business practice (violating SB 1322's reporting requirements or other laws);

iv.   Whether such conduct is unfair (in that it harms consumers and competition without countervailing benefits);

v.    Whether such conduct is fraudulent or deceptive, likely to mislead regulators, consumers, or the public about the true components of gasoline prices;

vi.   Whether and to what extent gasoline prices in California were higher than they would have been absent Defendants' misrepresented LCFS costs (i.e., the amount of the per-gallon overcharge, and the period of the overcharge);

vii.  What relief is necessary to enjoin Defendants from continuing the alleged misconduct, and to compel accurate cost reporting and pricing (including the nature of appropriate public injunctive relief); and

viii. What amount of restitution, disgorgement, and/or damages are Class Members entitled to, and how such relief should be calculated or distributed.

iii.  **Typicality (Rule 23(a)(3)):** Plaintiffs' claims are typical of those of all other Class Members. Plaintiffs, like all other Class Members, purchased gasoline in California during the relevant time period and were subjected to the **same overcharge** of roughly 5–8 cents per gallon that resulted from Defendants' uniform conduct. The injuries of all Class Members, including Plaintiffs, arise from a common course of conduct by Defendants: the artificial inflation of reported and actual gasoline pricing through a bogus LCFS cost. Thus, Plaintiffs and Class Members have the same or similar grievances, and their claims are based on the same legal theories (violations

of the UCL and antitrust laws). There are no defenses unique to Plaintiffs that would not apply equally to other Class Members.

iv. **Adequacy of Representation (Rule 23(a)(4)):** Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have no interests that conflict with or are antagonistic to the interests of other Class Members. Plaintiffs understand their duties and responsibilities to the Class and have retained counsel experienced in complex consumer class actions and public interest litigation. Plaintiffs' counsel are prepared to vigorously prosecute this action and have successfully litigated and resolved numerous consumer protection class actions. Together, Plaintiffs and their counsel will adequately represent the Class and ensure that the interests of all Class Members are protected.

64. This action is properly brought and may be properly maintained as a class action pursuant to Rule 23(b) for the following reasons:

i. **Declaratory and Injunctive Relief (Rule 23(b)(2)):** Certification under Rule 23(b)(2) is appropriate because Defendants, on the same or substantively similar grounds, violated Class Members' common law and statutory rights, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

ii. **Predominance and Superiority (Rule 23(b)(3)):** Certification is also appropriate under Rule 23(b)(3) because questions of law or fact common to the proposed Class predominate over any questions affecting only individual members of the proposed Class, and because a class action is superior to other available methods for fair and efficient adjudication of this controversy, including because:

   i. Defendants' common practices subjected the proposed Class to additional costs wrongly attributed to California's environmental regulations;

   ii. Without a class action, most Class Members would likely remain unaware of Defendants' misconduct and obtain no relief at all, whereas class litigation can provide notice and remedies to the entire affected population;

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

iii.   The core issues in this case are common to all Class Members and predominate over any individual issues, ensuring that a class action will yield determinations that apply to everyone;

iv.   Because Plaintiffs seek relief to benefit all consumers (not just those who might individually sue), a class action is the most effective method to achieve the broad remedial impact required;

v.   This action will ensure an orderly and expeditious administration of Class Members' claims and foster economies of time, effort, and expense, and ensure uniformity of decisions;

vi.   This action does not present any undue difficulties that would impede its management by the Court as a class action; and

vii.   The harm caused to each individual Class Member, while significant in the aggregate, is relatively small on a per-gallon or per-transaction basis (e.g., a few cents per gallon, translating to perhaps a dollar or two per fill-up), making it economically impractical for individual consumers to pursue separate lawsuits to recover the small overcharge on their own. Class treatment allows those numerous small injuries to be combined into a viable claim, thereby leveling the playing field and holding Defendants accountable at scale.

65.   **Superiority of Class Action:** A class action is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and the Class. Each proposed member of the Class has been damaged and is entitled to recovery by reason of Defendants' unlawful and unfair practices set forth above. Class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

/ / /

/ / /

/ / /

/ / /



## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violations of the California Unfair Competition Law**
**(Cal. Bus. & Prof. Code § 17200 et seq.)**

66.    Plaintiffs re-allege each of the allegations set forth in the preceding paragraphs.

67.    Bus. & Prof. Code § 17200 et seq. prohibits "any unlawful, unfair or fraudulent business act or practice." A § 17200 claim may be asserted "by a person who has suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. Plaintiffs assert violations of the unlawful and unfair prongs.

68.    Each plaintiff and member of the Class has standing to assert a UCL claim as each has lost money as a result of Defendants' unlawful and unfair inflation of gas prices.

69.    **Unlawful Business Practices**: Defendants' acts and practices as described above constitute "unlawful" business acts or practices within the meaning of Business & Professions Code § 17200. This unlawful conduct includes, inter alia, violations of SB 1322 and its implementing regulations. Specifically, by submitting monthly reports that overstated LCFS compliance costs by 5–8 cents per gallon under penalty of perjury, Defendants violated Public Resources Code § 25355 (requiring monthly reporting on the costs of LCFS compliance) and Title 20, Cal. Code Regs., § 1303(l)(8) (requiring reports to be submitted under penalty of perjury). Moreover, by those same actions, Defendants violated California Penal Code § 118. Accordingly, Defendants engaged in unlawful conduct by filing false reports.

70.    Defendants' conduct is also unlawful because it violated the Cartwright Act (Business & Professions Code § 16700 et seq.) and the Sherman Act (15 U.S.C. § 1), as alleged in the Second and Third Causes of Action below in paragraphs 78–99.

71.    By violating these laws and regulations, Defendants engaged in unlawful business practices proscribed by the UCL.

72.    **Unfair Business Practices**: Defendants' acts and practices also constitute "unfair" business acts or practices under Business & Professions Code § 17200, in that they mispresented the actual costs associated with the gasoline they sold and attributed nonexistent costs to the state's LCFS program. Defendants deliberately charged consumers for a cost that did not exist, effectively

1  adding a secret surcharge to gasoline under false pretenses. This practice caused substantial injury

2  to consumers (causing millions of dollars of collective overpayment) that was not reasonably

3  avoidable since consumers have no way to even know that prices are inflated, much less to avoid

4  paying the extra cents since all major refiners inflated their costs. There is no countervailing benefit

5  to consumers or competition.

6       73.    Defendants' conduct also violates the spirit and policy of the laws underlying

7  California's fuel regulations and consumer protections. The policy of SB 1322 and related

8  regulations is to promote transparency and accurate reporting; Defendants' conduct subverted that

9  policy by claiming false costs. The policy of the LCFS program is to cost-effectively reduce carbon

10 emissions, but Defendants' false inflation of costs undermines public support for that policy.

11 Defendants' conduct thus harms consumers and the marketplace by using inaccurate information to

12 erode support without countervailing benefit. It is thus unfair by any measure. Additionally,

13 Defendants gained an unfair competitive advantage over honest businesses by misrepresenting their

14 costs and possibly coordinating pricing, thereby distorting the market while escaping scrutiny.

15 Therefore, Defendants' conduct is "unfair" within the meaning of the UCL.

16      74.    **Causal Connection and Injury**: As a direct and proximate result of Defendants'

17 unlawful and unfair business practices, Plaintiffs and members of the Class have suffered injury in

18 fact and lost money or property. Plaintiffs and members of the Class paid excess money for

19 gasoline—specifically, the 5–8 cents per gallon overcharge—that they would not have paid absent

20 Defendants' misconduct. But for Defendants' false reporting and cost-padding scheme, either

21 gasoline prices would have been lower (in a competitive, honest market) or, at minimum, regulators

22 could have intervened sooner to prevent the overcharges. The economic injury (overpayment) is

23 concrete and quantifiable on a class-wide basis.

24      75.    **Unfair Competition Law Remedies**: Pursuant to Business & Professions Code

25 § 17203, Plaintiffs and members of the Class seek injunctive relief and restitution to prevent and

26 remedy Defendants' ongoing UCL violations. Specifically, Plaintiffs and members of the Class seek

27 an order enjoining Defendants from continuing the unlawful and unfair practices alleged, and

28 requiring Defendants to take affirmative steps to dissipate the effects of their past misconduct. Such

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

injunctive relief includes but is not limited to: (a) an injunction prohibiting Defendants from overstating any cost component in mandatory reports or public statements and requiring them to submit only true, accurate, and current costs; (b) an order compelling Defendants to correct past false reports (e.g., to file amended SB 1322 reports for all months in 2025 to reflect actual incurred LCFS costs) so that the public record is accurate; (c) an order requiring Defendants to provide notice to the public (for example, at gas stations or on company websites) of the truth about the LCFS cost overstatement, so consumers are no longer misled; (d) an independent audit or verification of Defendants' reported LCFS compliance costs and other cost components, at Defendants' expense, to ensure accuracy going forward; and (e) an order requiring Defendants to roll back or remove the phantom surcharge from current gasoline prices (to the extent they are still adding such cost in), or other measures to ensure that future prices are not inflated by costs that were never actually incurred. Plaintiffs further seek restitution and disgorgement of all monies that Defendants wrongfully obtained from Class members as a result of the overcharge, pursuant to Bus. & Prof. Code § 17203. This includes at least the 5–8 cents per gallon overcharge on each gallon sold from January 1, 2025 through May 31, 2025, an amount to be proven at trial. Plaintiffs and members of the Class also seek any other relief the Court deems proper, including but not limited to the appointment of a monitor or receiver to oversee compliance.

76.    **Public Injunctive Relief**: The injunctive relief Plaintiffs seek is fundamentally public in nature, in that it aims to prohibit and rectify deceptive practices that affect all California gasoline purchasers and the general public, not just individual class members. Plaintiffs seek to enjoin acts that threaten future injury to the public and to mandate truthful reporting which will benefit all consumers (indeed, all Californians who buy gasoline). This relief is consistent with and authorized by the UCL, and pursuant to *McGill v. Citibank, N.A.* (2017) 2 Cal.5th 945, any contractual waivers of such public injunctive relief (to the extent any class member had a consumer agreement with Defendants) are unenforceable. Plaintiffs are entitled to pursue this relief in court on behalf of the public.

77.    **Attorneys' Fees and Costs**: Under Code of Civil Procedure § 1021.5, Plaintiffs seek an award of attorneys' fees against Defendants for the prosecution of this action, since Plaintiffs are

acting as private attorneys-general to enforce important rights affecting the public interest, and the benefit achieved will be significant and widespread relative to the burden and cost of litigation. Plaintiffs also seek recovery of their reasonable costs of suit.

**SECOND CAUSE OF ACTION**
**Violations of the Cartwright Act - Unlawful Trust/Combination in Restraint of Trade**
**(Cal. Bus. & Prof. Code § 16720 et seq.)**

78.     Plaintiffs re-allege each of the allegations set forth in the preceding paragraphs.

79.     The Cartwright Act, Bus. & Prof. Code § 16700 et seq., is California's principal antitrust statute. It prohibits, inter alia, "a combination of capital, skill or acts by two or more persons" to "create or carry out restrictions in trade or commerce," "limit or reduce the production, or increase the price of merchandise or of any commodity," "fix at any standard or figure, whereby its price to the public or consumer shall be in any manner controlled or established, any article or commodity of merchandise, produce or commerce," or "make or enter into or execute or carry out any contracts, obligations or agreements of any kind or description" to do the same. Bus. & Prof. Code §§ 16720(a), (b), (d), and (e). Any person injured by such an unlawful trust may sue for treble damages and injunctive relief. Bus. & Prof. Code § 16750(a).

80.     **Combination and Agreement**. On information and belief, Defendants, as horizontal competitors in the market for refining and selling gasoline in California, engaged in a contract, combination, and conspiracy to restrain trade and artificially inflate the price of gasoline in California beginning on or about January 1, 2025. The combination is evidenced, inter alia, by monthly reports consistently inflating LCFS compliance costs and a simultaneous increase in California gas prices, all without legitimate justification. In its July 16, 2025, memorandum about retail gasoline prices and impacts of compliance with the LCFS regulation, CARB staff reviewed refiners' LCFS compliance costs submitted to the CEC and observed that these reported costs increased on January 1, 2025. On information and belief, Defendants reached a meeting of the minds or mutual understanding, whether through direct communications, facilitated by a trade association (such as the Western States Petroleum Association ("WSPA")), or signaling through industry publications, to implement the phantom LCFS surcharge in unison.

/ / /

**CLASS ACTION COMPLAINT**                                                                          28

81.    While Plaintiffs may not yet know the precise time and manner every agreement was made (prior to discovery), the factual allegations above, including but not limited to those set forth in paragraphs 30–58, strongly indicate the existence of an unlawful agreement.

82.    **Restraint of Trade**. Defendants' combination had the purpose and effect of restraining trade by raising, fixing, and stabilizing the price of gasoline in California at a level above what a competitive market would produce. Specifically, by agreement they fixed a component of the price (an extra 5–8 cents per gallon surcharge) that was not determined by free market forces. The harm to competition is clear: Consumers were forced to pay more, which may have reduced demand, harming the overall economy.

83.    **Effect on Prices and Competition**. As a direct result of Defendants' conduct, the price of gasoline in California was higher than it would have been absent the conspiracy. By collectively agreeing to inflate LCFS compliance costs, Defendants denied California consumers the benefits of competition. In summary, the combination restrained trade by eliminating competition as to a significant portion of the price.

84.    **Intent and Illegality**. Defendants engaged in the combination and conspiracy, whether explicitly or implicitly, to stifle competition and increase profits. Price-fixing agreements are illegal under the Cartwright Act, and Defendants' conduct constitutes an unlawful trust under Bus. & Prof. Code §§ 16720(a), (b), (d) and (e).

85.    **Injury to Plaintiffs and the Class**. Plaintiffs and Class members are "persons who have been injured in [their] business or property by reason of" Defendants' antitrust violations, within the meaning of Bus. & Prof. Code § 16750(a). Plaintiffs and members of the Class directly purchased gasoline at prices that were higher due to Defendants' collusion. This overcharge is a form of antitrust injury: it is the type of harm (supra-competitive pricing) that the antitrust laws aim to prevent, and it flowed from the Defendants' anti-competitive behavior. There is a direct causal link—Defendants fixed a price component, thereby inflating the retail price, and consumers paid that inflated price. There are no independent factors breaking the chain of causation; indeed the injury was the intended result of Defendants' scheme. Plaintiffs and Class members suffered monetary damages equal to the number of gallons they purchased times the amount of overcharge

per gallon (plus any consequential effects). The Class collectively has been damaged in an amount likely exceeding hundreds of millions of dollars (to be proven at trial) in the form of overpayments.

86.    **Damages**. Under the Cartwright Act, Plaintiffs and members of the Class are entitled to recover three times the amount of their actual damages (treble damages) for the injuries they have sustained, plus interest and attorneys' fees. Plaintiffs will seek to prove the exact amount of the overcharge per gallon and multiply that across the Class's purchases. For pleading purposes, if the overcharge began in January 2025 and continued at roughly 5 cents per gallon through May 2025, and assuming roughly 5.5 billion gallons sold in that timeframe (for five months out of at least 13 billion gallons annually) to consumers, the actual damages would be at least $275 million. Trebling that would make antitrust damages roughly $825 million (minus any offsets or mitigation). These figures will be refined with expert analysis and data, but it is clear that the damages are far from trivial. Plaintiffs seek full treble damages as provided by law.

87.    **Injunctive Relief (Antitrust)**. In addition to damages, Plaintiffs and members of the Class seek permanent injunctive relief under the Cartwright Act (Bus. & Prof. Code § 16750) and under general equitable powers to prohibit Defendants from continuing their combination or engaging in similar anti-competitive conduct. The need for injunctive relief is especially acute because absent an injunction, nothing prevents Defendants from devising new ways to collude or continuing this scheme by finding new pretexts for price coordination. The public will continue to suffer irreparable harm (in the form of paying supra-competitive prices) unless the Court enjoins Defendants. Plaintiffs request an order dissolving the combination and enjoining Defendants from agreeing or communicating about future pricing decisions related to cost pass-throughs or similar items, except as allowed by law. The injunctive relief sought under the UCL (as detailed above) is complementary to the antitrust injunction, as both aim to restore a competitive, honest marketplace.

88.    **Attorneys' Fees and Costs (Antitrust)**. Pursuant to Bus. & Prof. Code § 16750, subdivision (a), a prevailing plaintiff "shall be awarded a reasonable attorneys' fee together with the costs of the suit." Therefore, Plaintiffs seek recovery of their attorneys' fees and litigation costs for this cause of action, in addition to those recoverable under other theories. Plaintiffs also seek pre-

judgment interest as allowed (to compensate for the loss of use of their funds due to the overcharges) and post-judgment interest on any judgment entered.

89.    **Joint and Several Liability**. Each Defendant is jointly and severally liable for all damages awarded, as they acted in pursuit of a common scheme. Under antitrust law, each co-conspirator may be held liable for the entire harm caused by the conspiracy. There is no double recovery issue because the damages measured are the aggregate overcharge, not cumulative.

90.    In summary, Defendants formed and operated an illegal trust in restraint of trade, in violation of the Cartwright Act, causing Plaintiffs and the Class to pay higher prices for gasoline. Plaintiffs accordingly seek all relief available under the law, including treble damages, injunctive relief, fees, and costs.

### THIRD CAUSE OF ACTION
**Violation of Section 1 of the Sherman Act**
**(15 U.S.C. § 1)**

91.    Plaintiffs re-allege each of the allegations set forth in the preceding paragraphs.

92.    From at least January 2025 through May 2025, and continuing until the effects of their unlawful conduct cease, Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade that substantially affects interstate commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

93.    The contract, combination, or conspiracy consisted of an agreement among Defendants to inflate, fix, stabilize, and maintain artificially high gas prices based on misrepresented LCFS compliance costs.

94.    While Plaintiffs may not yet know the precise time and manner every agreement was made (prior to discovery), the factual allegations above, including but not limited to those set forth in paragraphs 30–58, strongly indicate the existence of an unlawful agreement.

95.    Defendants increased their reported LCFS compliance costs and their associated gas prices for the purpose and effect of carrying out their unlawful agreement to inflate, fix, stabilize, and maintain artificially high gas prices based on misrepresented LCFS compliance costs.

96.    Defendants' conspiracy had the following effects, among others:

i.    Reported LCFS compliance costs have been inflated;

  ii.  Wholesale gasoline prices and as a result retail gasoline prices have been fixed and maintained at artificially high prices across California; and

  iii.  Plaintiffs and members of the Class have been deprived of the benefits of free and open competition, including fair market prices for gasoline.

  97.  Plaintiffs and members of the Class have been injured and will continue to be injured in their business and property by being forced to pay more for gasoline than they would have in the absence of the Conspiracy.

  98.  The alleged contract, combination, or conspiracy is a per se violation of Section 1 of the Sherman Act.

  99.  Plaintiffs and members of the Class are entitled to damages, including treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, as well as injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, preventing and restraining further violations of the antitrust laws.

## VII. <u>PRAYER FOR RELIEF</u>

  100.  WHEREFORE, Plaintiffs on behalf of themselves and Class members pray for the following relief:

  a. **Class Certification**: That this action be certified as a class action pursuant to CCP § 382; that Plaintiffs Ken Herold, Gina Stabile, Lynn Elias, Michael Simmons, and Robert Lasiewicz be appointed as representatives of the Class; and that Plaintiffs' counsel be appointed as counsel for the Class.

  b. **Injunctive Relief**: For public injunctive relief and other equitable relief according to proof.

  c. **Restitution and Disgorgement**: For an order compelling Defendants to make full restitution to Plaintiffs and the Class of all amounts unlawfully collected from them (the gasoline price overcharges from January 1, 2025 to May 31, 2025), and/or to disgorge all profits obtained by Defendants as a result of their wrongful acts, to the extent such profits exceed the restitution amount. Such funds should be returned to the injured Class members according to proof, or if direct restitution is impractical, via cy pres or fluid recovery for the benefit of the Class under Court supervision.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

d. **Damages (Antitrust)**: For actual damages sustained by Plaintiffs and the Class as a result of Defendants' antitrust violations, in an amount to be determined at trial, and for these damages to be trebled pursuant to Bus. & Prof. Code § 16750(a). Plaintiffs seek treble damages on behalf of the Class in an amount to be proven (which is currently estimated to be in the hundreds of millions of dollars before trebling).

e. **Attorneys' Fees**: For an award of reasonable attorneys' fees pursuant to, inter alia, Code of Civil Procedure § 1021.5 (private attorney general statute), Business & Professions Code § 16750(a) (Cartwright Act fee provision), and any other applicable contract, statute, or common law doctrine (such as the common fund or substantial benefit doctrine), given that this action enforces important rights affecting the public interest and that a successful outcome will confer a significant benefit on a large class of persons (the public).

f. **Costs of Suit**: For an award of costs of suit and expenses incurred in this litigation, including expert witness fees, pursuant to law (including but not limited to Bus. & Prof. Code § 16750 and Code Civ. Proc. § 1032 et seq.).

g. **Pre- and Post-Judgment Interest**: For pre-judgment interest at the maximum legal rate on all amounts awarded (whether as damages, restitution, or penalties) from the date of injury or the filing of this complaint (as appropriate) until entry of judgment, and for post-judgment interest at the legal rate from the date of judgment until full satisfaction thereof, according to applicable law, to compensate the Class for the loss of use of funds and the effects of inflation.

h. **Such Other Relief**: For such other and further relief as the Court deems just, equitable, and proper. This includes but is not limited to any declaratory relief (such as a declaration that Defendants' conduct was unlawful) or other relief within the Court's powers to fully adjudicate the rights of the parties and protect the interests of Class members and the general public.

/ / /

/ / /

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

## VIII.  <u>JURY DEMAND</u>

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: November 26, 2025

**COTCHETT, PITRE & McCARTHY, LLP**

By:  */s/ Niall P. McCarthy*
NIALL P. McCARTHY
ADAM J. ZAPALA
ELIZABETH T. CASTILLO
REGINA WANG
KEVIN J. BOUTIN

**CONSUMER WATCHDOG**

By:  */s/ William Pletcher*
HARVEY ROSENFIELD
WILLIAM PLETCHER

**TUSAN LAW, PC**

By:  */s/ Christina Tusan*
CHRISTINA TUSAN
ADRIAN BARNES

*Attorneys for Plaintiffs and the Proposed Class*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## ATTORNEY ATTESTATION

I, Niall P. McCarthy, am the ECF User whose ID and password are being used to file this Class Action Complaint. In compliance with Civil Local Rule 5-l(h)(3), I hereby attest that concurrence in the filing of this document has been obtained from each signatory.

Dated: November 26, 2025             _/s/ Niall P. McCarthy_
                                      NIALL P. McCARTHY